Cynthia L. TAYLOR, Plaintiff-Appellant,

v.

Marvin T. RUNYON, Postmaster General, United States Postal Service, Defendant-Appellee.

No. 97-3202.

United States Court of Appeals,

Eleventh Circuit.

May 4, 1999.

Appeal from the United States District Court for the Middle District of Florida. (No. 95-410-CIV-ORL-18), G. Kendall Sharp, Judge.

Before HATCHETT, Chief Judge, MARCUS, Circuit Judge, and KRAVITCH, Senior Circuit Judge.

HATCHETT, Chief Judge:

Appellant Cynthia L. Taylor appeals the district court's grant of appellee United States Postal Service's motion for judgment as a matter of law in her Title VII gender discrimination and retaliation lawsuit. We reverse and remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

Cynthia Taylor began her employment with the United States Postal Service (Postal Service) in 1979, at Syracuse, New York. Taylor gradually moved into management in 1987 at the main north branch in Syracuse, New York, as an electronic technician supervisor. At that facility, Taylor was responsible for mail processing equipment and supervisory responsibilities, including supervision of maintenance craft employees who worked on heating and ventilation equipment, and the building custodial staff. Taylor worked in that job until 1990, when Carl Sumner hired her as a superintendent of maintenance for mail processing equipment at the mid-Florida facility in Lake Mary, Florida. Taylor worked in that capacity from September 1990 until December 1992. Sumner hired Taylor at an executive administrative pay scale (EAS) level of 17.

When Taylor first occupied her position as superintendent at mid-Florida, she supervised 45-50 people, including subordinate supervisors who managed the craft individuals responsible for building maintenance functions. At the time Sumner hired Taylor, the mid-Florida facility also employed Hal Maloof,

an EAS-14, who supervised 6 craft people and supervisors and Del Scott, an EAS-11, who supervised approximately 15 custodians with no subordinate supervisors. In 1991, the Postal Service promoted Scott to an EAS-15, where he became supervisor of building equipment maintenance.

In 1992, the Postal Service underwent a massive reorganization of management positions where all managers lost their job titles and the Postal Service changed the management complement for each facility. The new complement of EAS levels for the Florida facility included one EAS-20 position, one EAS-18 position, one EAS-17 position and six EAS-16 positions. Immediately prior to the reorganization, Sumner held an EAS-20 position, Taylor an EAS-17 position, Scott an EAS-15 position and Maloof an EAS-14 position. No EAS-18 position existed prior to the reorganization. The reorganization essentially combined Taylor's EAS-17 position and Scott's EAS-15 position into one new position, thereby creating the EAS18 position. Sumner was the selecting official at mid-Florida for the reassignment of positions during the reorganization.

For reassignment under the new system, employees had to be within three grades of their old position, although exceptions existed. As a result, Taylor was eligible for reassignment positions between EAS-14 and EAS-20. In order to apply for one of the new positions, an employee had to fill out a Form-991, listing permanent positions, details, non-postal activities, postal training and a narrative of work accomplishments. Taylor filled out a Form-991.

Prior to the reorganization, Taylor received two evaluations from Sumner, where his overall score for Taylor's performance was "very good," the second highest rating available in the Postal Service format. Taylor received no discipline in any form prior to the reorganization, and her lowest rating in any of the individual factors considered in her 1992 evaluation was "good."

Pursuant to the reorganization, Taylor interviewed in West Palm Beach, Florida, on December 15, 1992, to discuss a possible EAS-20 position at that Postal Service facility. West Palm Beach offered Taylor the EAS-20 position, and she returned immediately to mid-Florida to discuss her options with Sumner. When

Taylor spoke to Sumner upon her return, she believed that Sumner told her that the options available to her were either the EAS-20 position in West Palm Beach or the newly created hybrid EAS-18 position in mid-Florida. Based upon this representation, Taylor called the West Palm Beach facility manager and refused the West Palm Beach offer, counting on a forthcoming offer from Sumner for the EAS-18 position in mid-Florida.

Later that day, Sumner left telephone messages at Taylor's home telling her he needed to speak with her. When Sumner reached Taylor, he told her that he would have to choose between Taylor and Scott for the EAS-18 position. Taylor testified at trial that Sumner then told her that he was leaning toward selecting Scott for the EAS-18 position because Scott had a wife and children and needed the money more than Taylor. Sumner denied that he told Taylor, or insinuated, that he preferred Scott because Scott was a man and Taylor was a woman, or that Scott needed the money more because he was a family man. Sumner claimed to only remember telling Taylor that they were all friends, and that this decision put him in a difficult predicament.

On December 16, 1992, Taylor learned that the Postal Service had placed Maloof in the EAS-17 position in maintenance. Soon after learning of Maloof's EAS-17 promotion, Taylor learned that the Postal Service had placed Scott in the new EAS-18 position. The Postal Service eventually placed Taylor in one of the EAS-16 positions, effectively a demotion; however, she continued to receive her level 17 pay. A few days after her reassignment, Taylor asked Sumner why he had not placed her in the EAS-18 position. In response, Sumner stated that Scott was stronger in building services, and that the employee opinion survey reflected morale problems among Taylor's subordinates. Sumner also told Taylor that she did not have the people skills that Scott possessed, and that she did not know enough about building maintenance to earn the position over Scott.

As a courtesy to Sumner, Taylor provided formal notification of her intent to file a Postal Service Equal Employment Opportunity (EEO) complaint regarding his selection decision. Taylor strongly asserts that after filing her complaint of discrimination, the work environment changed dramatically from very

3

pleasant to very hostile. Taylor began to routinely receive critical and negative memos from both Scott and Sumner regarding her performance, and she began experiencing difficulty in obtaining time off. She was left out of office events and criticized for matters that she did not control.

In September 1993, Taylor received a letter of warning for inappropriate conduct and for failure to follow Scott's instructions (her new supervisor). The reason that Scott formally warned Taylor was because she reported to the plant support manager that Scott and Sumner were out playing golf on company time when, in fact, both were on approved leave. Taylor challenged this letter of warning, which the Postal Service subsequently mitigated.

In December 1995, Taylor received another letter of warning from Scott asserting that Taylor had engaged in improper conduct in bringing her personal computer monitor into the building and having one of the electronic technicians repair it. Scott disciplined Taylor for using government property, postal equipment and a postal employee's time for personal gain. Taylor countered that many postal employees brought in personal property, including "boom boxes," golf equipment, computer games and music CDs.

Finally in 1995, the Postal Service's National Maintenance Leadership Program that grooms certain Postal employees for higher level maintenance managerial positions excluded Taylor. The Postal Service originally selected Taylor from a national competition to participate in this program. The National Maintenance Leadership program excluded Taylor after the program director met with Sumner. After learning of her expulsion from the program, Taylor attempted to determine whether the director would reconsider his decision because the director gave her no explanation for the expulsion. In response to her inquiry, the director informed Taylor that because letters of warning to EAS employees were a rarity, and because Sumner had exposed her disciplinary warnings, she was expelled based on those warnings. The director explained, however, that although his decision was based upon his discussion with Sumner about her performance, that if Sumner were to ask him to reinstate Taylor, he would do so. Taylor spoke to Sumner and explained the reinstatement offer. Sumner informed Taylor that he no longer trusted her because she had

questioned his decision about the selection of Scott and had filed an EEO complaint against him.  Further, Sumner stated that Taylor's lawyer had made him uncomfortable during the legal proceedings in her discrimination action, and that such activity was something supervisors should never do to a superior.  Taylor claims that Sumner further stated that in filing her EEO complaint, she showed a bad attitude, and that as long as he was in charge, her career with the Postal Service was going nowhere.  At the time of trial, Taylor continued to occupy her reassigned EAS-16 position.

## II. PROCEDURAL HISTORY

Taylor brought this action against the Postal Service pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.,* as amended in 42 U.S.C. § 1981(a) (1994).  Taylor contends that the Postal Service subjected her to gender discrimination and retaliation in violation of federal law.

On September 11, 12 and 15, 1997, a jury trial ensued.  At the conclusion of Taylor's case, the Postal Service moved for judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50(a) on both of Taylor's claims.  At the conclusion of oral arguments on the motion, the district court made various factual and legal findings and granted the Postal Service's motion for judgment as a matter of law as to both claims.  The district court entered final judgment on behalf of the Postal Service on September 15, 1997.

## III. ISSUES

The issues are:  (1) whether the district court erred in granting judgment as a matter of law against Taylor's claim of gender discrimination;  and (2) whether the district court erred in granting judgment as a matter of law against Taylor's claim of retaliation.[1]

## IV. DISCUSSION

---

[1]Taylor raises one additional issue contending that the district court committed reversible error in denying the admission of portions of a Postal Service employee's affidavit as hearsay when the employee was present in the courtroom and available to testify.  On this issue, we affirm the district court's denial pursuant to 11th Circuit Rule 36-1.

We review a district court's grant of judgment as a matter of law *de novo,* applying the same legal standards as those used in the district court. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 993 (11th Cir.1993), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994). We must "consider 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* --- U.S. ----, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). Thus, we must consider all of the evidence in the light most favorable to Taylor and decide whether " 'a substantial conflict in evidence [exists] to support a jury question.' " *See Combs,* 106 F.3d at 1526 (quoting *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)).

A.     Gender Discrimination Claim

Taylor contends that the district court committed reversible error in failing to recognize that she introduced direct evidence of discrimination, thereby creating a jury issue. Taylor also contends that the trial court failed to weigh the evidence she submitted properly to rebut the Postal Service's articulated legitimate, nondiscriminatory reasons for her non-selection to the EAS-18 promotion.

Taylor argues that the initial reason Sumner articulated for his decision to select Scott was that Scott was a married man with a wife and children to support. Taylor contends that in an analogous case, *Thompkins v. Morris Brown College,* the plaintiff testified that the defendant informed her that his decision to hire male colleagues over her into full-time positions "was because those males had families and needs that the plaintiff did not have." 752 F.2d 558, 561 (11th Cir.1985). The *Thompkins* court held that such comments constituted direct evidence of sex discrimination. 752 F.2d at 563. Taylor argues that the same reasoning should apply here, as she claims that Sumner's decision to select Scott was because Scott was a married man with a wife and children to support, and that Taylor did not need the money as much as Scott.

6

To establish a *prima facie* case of Title VII gender discrimination in a promotional decision, Taylor must prove: (1) that she is a member of a protected minority; (2) that she was qualified and applied for the promotion; (3) that she was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted. *Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989). "Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " *Wu,* 847 F.2d at 1483-84 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

The Postal Service did not argue at trial, and does not argue in this appeal, that Taylor failed to meet her initial *prima facie* burden. The Postal Service does argue, however, that the existence of *prima facie* proof "does not in and of itself foreclose the possibility of [judgment as a matter of law] being granted in favor of the employer." *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). The Postal Service asserts that once Taylor had established a *prima facie* case, the presumption of discrimination existed and the burden of persuasion shifted to the Postal Service to produce legitimate, nondiscriminatory reasons for the challenged employment action. *Young,* 840 F.2d at 828. The Postal Service maintains that it plainly articulated legitimate, nondiscriminatory reasons for the decision not to select Taylor for the level 18 position. Accordingly, any "presumption of discrimination created by the *McDonnell Douglas* framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.' " *Combs,* 106 F.3d at 1528 (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

The Postal Service articulated three nondiscriminatory reasons for its challenged employment decision. The selecting official, Sumner, explained that he selected Scott because (1) Scott had more experience in the building services and building maintenance area than Taylor, (2) the morale of the

7

workforce was low during the period when Taylor was superintendent, and (3) Scott did not have the same communication deficiencies as Taylor.

"We have defined direct evidence as evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997) (internal citations and quotation omitted). Our decision in *Thompkins* strongly suggests that the type of statement at issue here constitutes direct evidence. *See* 752 F.2d at 561-63. In that case, the employer terminated a female instructor for holding outside employment even though the employer permitted similarly situated male instructors to engage in the same practice. The plaintiff testified that one of the decision-makers in her case had stated that "he saw no reason for a woman to have a second job," and another had said that the male employees "had families and needs that the plaintiff did not have." *Thompkins,* 752 F.2d at 561. We held that these statements constituted direct evidence of discrimination. In this case, Taylor testified that Carl Sumner told her he was going to select Del Scott because:

> Del has a family, he's got a wife, he's got three children and he [Sumner] let me [Taylor] know that one of Del's children was having some kind of, had just had an operation of some sort. He told me that Del needed the money and that the position was more important for Del to receive the position than it was for me to get the position. And I didn't need the money.[2]

---

[2]While we have considered this evidence only as part of the circumstantial evidence in this case, we observe that if we had considered this as a direct evidence case, judgment as a matter of law would be inappropriate. *See Merritt,* 120 F.3d at 1189; *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir.1998). " 'Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, [motion for judgment as a matter of law] is not appropriate even where the movant presents conflicting evidence.' " *Merritt,* 120 F.3d at 1189 (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)). We have likewise held that, in cases of discrimination proven by direct evidence, it is incorrect to rely on the *McDonnell Douglas* test because, while circumstantial evidence is used to create an inference of discrimination under *McDonnell Douglas,* no such inference is required in the case of direct evidence. *See Thompkins,* 752 F.2d at 563. Therefore, "when there is direct evidence 'that the defendant acted with a discriminatory motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved.' " *Thompkins,* 752 F.2d at 563 (quoting *Bell v. Birmingham Linen Serv.*, 715 F.2d 1552, 1556 (11th Cir.1983)).

8

A plaintiff may overcome the employer's asserted legitimate reasons and avoid judgment as a matter of law "either directly by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.*" *Combs,* 106 F.3d at 1528 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089). Casting doubt on an employer's asserted reasons for an adverse employment action does not require judgment for the plaintiff, but it permits a reasonable jury to infer that the employer acted with the forbidden animus and therefore precludes judgment as a matter of law. *See Combs,* 106 F.3d at 1529.

Sumner's contemporaneous statement regarding Scott's family obligations and corresponding financial needs amounts to evidence that the reasons for Scott's selection were not those the Postal Service offered at trial. Taylor contends that Sumner's subsequent justifications are nothing more than post-hoc attempts at misdirection and that his initial statement more accurately reveals his intentions. To rebut the reasons the Postal Service proffered at trial, Taylor first cites the Postal Service's offer of a more senior job in another office as evidence that she possessed the general qualifications for the position under review. More specifically, although Taylor concedes that Scott had more direct experience in building services and building maintenance than she, Taylor points out that she supervised Scott in those roles and emphasizes that the position at issue was a supervisory one. She argues that her greater responsibility, her supervision of Scott in these areas, and her vastly greater experience in machine maintenance would permit a jury to disbelieve that Sumner actually relied on Scott's experience when he promoted Scott.

To rebut the Postal Service's second justification, Taylor contends that the survey regarding employee morale during her tenure as a superintendent measured the employees' attitude toward her and Scott collectively. She argues that because the survey does not distinguish between her and Scott, the Postal Service's attempt to rely on it obviously is pretextual. Finally, Taylor argues that no evidence supports the Postal Service's contention that Scott possessed communication skills superior to Taylor. *See generally Carter,* 132 F.3d at 643-44 (rejecting an employer's subjective judgment that an employee lacked "exceptional

verbal and written skills" because the evidence showed no objective support for that contention).  Taylor also argues that performance reviews, conducted three months before the 1992 reorganization, gave Scott and Taylor equivalent evaluations on their communication skills and that, although Scott and Taylor received the same "very good" overall rating, her scores in the individual categories outshone those of Scott.

The evidence at trial, when viewed in the light most favorable to Taylor, certainly could give a jury a reason to disbelieve the Postal Service's proffered reasons for Scott's selection.  *Combs* requires nothing more to foreclose judgment as a matter of law.  *See* 106 F.3d at 1528.  Beyond that, a jury could interpret Sumner's statement regarding Scott's financial position as an indication that he made the decision based on his view of the relative pecuniary needs of Scott and Taylor (as individuals rather than as male and female) or as evidence of sex discrimination in violation of Title VII. That decision, however, was for the jury. Consequently, we reverse the district court's entry of judgment as a matter of law on Taylor's discrimination claim.

B.      Retaliation Claim

 In order to establish a *prima facie* case of Title VII retaliation, Taylor must show "(1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action." *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993).  Once Taylor has established a *prima facie* case, the Postal Service must then come forward with "legitimate reasons for the employment action to negate the inference of retaliation." *Goldsmith,* 996 F.2d at 1163.  If the Postal Service offers legitimate reasons for the employment action, Taylor then bears the burden of proving, through a preponderance of the evidence, that the reasons offered are pretextual. *Goldsmith,* 996 F.2d at 1163.  In order to establish the "causal link" required as part of her *prima facie* case, Taylor "need only establish that 'the protected activity and the adverse action were not wholly unrelated.' " *Goldsmith,* 996 F.2d at 1163 (quoting *EEOC v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993)).

10

Taylor vigorously contends that we must reverse the district court because in granting judgment as a matter of law on her retaliation claim, the district court announced its decision under a fundamental misstatement of the law. Taylor argues that the district court did not properly articulate the relationship between a retaliation claim and an underlying gender discrimination claim. In its oral ruling, the district court held that "if there was no discrimination because of sex, therefore, there was no[ ] retaliation." Taylor asserts that this is simply a misstatement of the law. We agree.

Under Title VII, it is well established that an employee need not prove the underlying claim of discrimination in order to establish a retaliation claim. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989). Instead, an employee's opposition to the discrimination is protected if she can reasonably form a good faith belief that the alleged discrimination existed. *Tipton,* 872 F.2d at 1494. Taylor meets this burden.

Because Taylor testified that she believed Sumner selected Scott over her for the EAS-18 promotion due to (1) Scott's "family man" status, and (2) because he needed the money more than she did, her activity in filing the discrimination claim is protected because she filed it in good faith believing that the discrimination actually existed. *See Tipton,* 872 F.2d at 1494. Having cleared this hurdle, Taylor's retaliation claim can stand alone, regardless of whether Taylor proved or the district court dismissed the underlying claim of gender discrimination. *See Tipton,* 872 F.2d at 1494.

Despite the district court's misstatement of the law, we must still examine whether Taylor established a *prima facie* case of retaliation such that she escapes the district court's grant of judgment as a matter of law. Taylor asserts that Sumner made a direct representation to her that because of her gender discrimination claim against him, her career was going nowhere. Taylor claims that such a statement is classic direct evidence, and that the statement reflects a retaliatory attitude and correlates easily to the complained of retaliation. *See Merritt,* 120 F.3d at 1189-90. Taylor testified that Sumner proclaimed her no longer worthy of his trust because she filed a discrimination claim against him. Taylor also testified that Sumner refused to recommend

11

her for advanced training courses because she exhibited a bad attitude in filing her discrimination claim. All three of Sumner's statements readily come within our examples of direct evidence enunciated in *Merritt. See* 120 F.3d at 1189-90.

Further, Taylor testified at length that after the filing of her EEO complaint for gender discrimination, Sumner and Scott subjected her to unpleasant and abusive situations in her work environment. Taylor asserts that the temporal connection between the change in her work environment and the filing of her EEO charges sufficiently satisfies the causal link requirement for her retaliation claim. *See Goldsmith,* 996 F.2d at 1163.

Taylor also received two letters of warning after the filing of her EEO charge. Such letters of warning are rare for Postal Service management level employees. Moreover, particularly concerning the 1995 letter of warning, Taylor has testified that the punishment was disproportionate to the offense. Taylor testified that the Postal Service's prohibition on bringing personal property onto the work floor is routinely violated, and aside from her letter of warning, such violations are never punished. Because of these warning letters, the Postal Service dismissed Taylor from an important career management training group, thereby damaging her career.

Finally, Taylor testified that prior to the filing of her discrimination complaint, she routinely received details (management training seminars) to higher level positions to provide her with additional management training. Taylor testified that since the filing of her EEO complaint the Postal Service has given her no substantive detail assignments, at least no detail assignments with reasonable notice.

Taylor's opposition to her perceived mistreatment due to her gender is statutorily protected expression. She more than adequately outlined adverse employment action resulting from the filing of her discrimination claim. Taylor's protected activity and the adverse employment action were not wholly unrelated. *See Goldsmith,* 996 F.2d at 1163. Thus, Taylor provided the district court with not only direct evidence of retaliation, she also met her *prima facie* burden of Title VII retaliation. After considering the

12

evidence in the light most favorable to Taylor, we hold that a substantial conflict exists in the evidence to support a jury question. *See Combs,* 106 F.3d at 1526.

Based upon our holding in *Merritt,* we hold that Taylor introduced sufficient retaliatory evidence to create a jury question that is significant enough to escape the district court's grant of judgment as a matter of law. Furthermore, we reiterate our precedent enunciating the principle that even if a gender discrimination claim fails, plaintiffs may still prevail on a retaliation claim if they meet the *Goldsmith* retaliation standard. *See Tipton,* 872 F.2d at 1494. The district court erred in holding that when Taylor's gender discrimination claim failed, her retaliation claim also failed. We reverse that portion of the district court's holding and remand this issue for further proceedings.

## V. CONCLUSION

In sum, we reverse the district court's grant of judgment as a matter of law against Taylor's Title VII gender discrimination claim and her claim for retaliation.

REVERSED and REMANDED.